UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MISSOURI COALITION FOR THE          )
ENVIRONMENT, OZARK CHAPTER OF       )
THE SIERRA CLUB, WEBSTER GROVES     )
NATURE STUDY SOCIETY, and           )
AMERICAN BOTTOM CONSERVANCY,        )
                                    )
               Plaintiffs,          )
                                    )
          vs.                       )     No. 4:03CV1074-DJS
                                    )
KEVIN WILLIAMS, UNITED STATES       )
ARMY CORPS OF ENGINEERS, and        )
HOLCIM (US) INC.,                   )
                                    )
               Defendants.          )

ORDER

Plaintiffs, a collection of various environmental groups, have brought this action challenging a decision by defendant Army Corps of Engineers ("Corps") to issue a permit to defendant Holcim (US) Inc. ("Holcim") for the construction of a cement manufacturing facility.[1]  Under the Administrative Procedure Act ("APA"), 5 U.S.C. §701 et seq., plaintiffs seek judicial review of the Corps' decision to issue the permit.  Plaintiffs further allege that the Corps' decision violates the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA").

Holcim proposes to build a cement manufacturing plant on a 4,000 acre site in Ste. Genevieve and Jefferson Counties,

_____

[1]Kevin Williams is also named as a defendant in his capacity as District Engineer of the Unites States Army Corps of Engineers.

Missouri.  The site for the proposed plant contains wetlands and streams.  The plans for the cement plant include the discharge of dredged or fill material into the waters of the United States and the construction of a harbor for the transportation of goods and materials.  To facilitate these plans Holcim applied to the Corps, on August 8, 2000, for a permit to fill waters of the United States under §404 of the CWA, 33 U.S.C. §1344, and to obstruct the navigable waters of the United States under §10 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. §403.  Nearly three years later, on July 8, 2003, the Corps issued its Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") and granted the permit.

Plaintiffs claim to have been adversely affected by the decision of the Corps to issue the permit, and defendants do not challenge the plaintiffs' standing to seek judicial review of the Corps' decision under the APA.  Plaintiffs argue that the Corps wrongly issued the permit without preparing an Environmental Impact Statement ("EIS"), without ensuring that practicable alternatives were unavailable, and without providing for public participation. Defendants contend that the permit was issued in full compliance with all applicable laws and regulations and should be upheld.  The parties have agreed to submit this matter to the Court for resolution on cross-motions for summary judgment.

**Analysis**

A court reviewing an agency action under the APA "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. §706.  An agency action "includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. §551(13).  As such, the Corps decision to issue the permit constitutes an "agency action" under the APA.  See March v. Oregon Natural Resources Council, 490 U.S. 360 (1988).  A reviewing court must uphold the agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).  A decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The scope of review is narrow and the reviewing court should not substitute its judgment for that of the agency.  Central S.D. Coop. Grazing Dist. v. Secretary of U.S. Dep't. of Ag., 266 F.3d 889, 895 (8th Cir. 2001).  Rather, a reviewing court should determine "whether the decision was based on a consideration of the relevant factors and whether there has been

3

a clear error of judgment." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

In making this determination, a reviewing court should consider "the whole record or those parts of it cited by a party." 5 U.S.C. §706. Here, the parties have filed the Administrative Record ("A.R."). In addition, plaintiffs have attached an April 28, 2003 letter from plaintiff's counsel to the Missouri Department of Natural Resources ("MDNR") to their reply in support of their motion for summary judgment. Defendants have filed a motion to strike the letter.[2] Before a reviewing court may permit supplementation of the administrative record "there must be a strong showing of bad faith or improper behavior." <u>Newton County Wildlife Ass'n v. Rogers</u>, 141 F.3d 803, 807 (8th Cir. 1998). In this case there has not been any showing of bad faith or improper behavior in the exclusion of the letter from the A.R. Furthermore, while the letter is dated April 28, 2003, there is nothing before the Court to indicate that it was received by the Corps prior to the end of its review on May 1, 2003. EA at 2 ("No comments received after <u>1 May 2003</u>, the end of [the Corps'] review, were considered.") (emphasis in original).[3] As such, the Court will

---

[2]Defendants' motion to strike also seeks to strike two other exhibits attached to plaintiffs' reply. However, these exhibits are included in the A.R. making the motion to strike moot with respect to these exhibits.

[3]Both the EA and the Corps' Response to Comments are located in the A.R at tab A-9.

grant defendants' motion with respect to exhibit 1 attached to plaintiffs' reply. Excluding this exhibit, the Court will consider the entire A.R. in reviewing whether the Corps complied with applicable law in issuing the permit to Holcim.

I.  Environmental Impact Statement

NEPA was instituted, *inter alia*, "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. §4321. These goals are meant to be accomplished by "focusing Government and public attention on the environmental effects of proposed agency action." Marsh, 490 U.S. at 371. However, NEPA is essentially procedural and "does not work by mandating that agencies achieve particular substantive environmental results." Id. Rather, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Id.

To insure that federal agencies act with complete information NEPA requires that all agencies, including the Corps, prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C). Council on Environmental Quality regulations provide that an agency should prepare an EA to determine whether the agency action significantly affects the environment and thus requires preparation of an EIS. 40 C.F.R. §1501.4. If, after preparing an

EA, the agency determines that the action does not significantly affect the environment then it must prepare and publish a FONSI. Id.  In the case at bar, the Corps did prepare an EA, made a finding of no significant impact, and declined to prepare an EIS. This decision must be affirmed if the Corps "took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI." Newton County, 141 F.3d at 809.

       An agency takes a "hard look" at the environmental consequences if it prepares a detailed statement "from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect." Mid States Coalition for Progress v. Surface Trans. Bd., 345 F.3d 520, 533-34 (8th Cir. 2003) (quoting Minnesota Pub. Interest Research Group v. Butz, 541 F.2d 1292, 1299 (8th Cir. 1976)).  As stated, the Court looks to the A.R. including the EA and the Corps' Response to Comments ("RTC") to determine if the Corps took a hard look at the environmental consequences of the project.[4]  The parties dispute whether a hard look was taken at a number of relevant areas of environment concern, specifically those of air pollution impact,

---

[4]The Court notes that plaintiffs initially contend that the Corps improperly believed it was "not necessarily required to consider the 'entire project' under NEPA." RTC at p. 23.  However, the Court need not resolve this issue as the Corps ultimately chose to analyze "the environmental impacts of the entire project" in its EA and RTC.  Id.

the number of stream miles impacted, and the cumulative impact of harbor dredging.

Both the EA and the RTC include analysis on the impact of the cement plant air emissions on the environment. See e.g., EA at pp. 57-59; RTC at pp. 82-90. First, the EA discusses standard air dispersion modeling tests performed on the potential impacts of particulate matter (i.e. dust and engine exhaust). EA at pp. 57-58. Under the "worst case" scenarios modeled, particulate matter concentrations were below the applicable National Ambient Air Quality Standards using both the established $PM_{10}$ standard and the new $PM_{2.5}$ standard. Id. at 58. Thus, the Corps concluded that "[t]he modeling results show that no significant impact would occur to human health from project particulate matter emissions, either in the area immediately surrounding the project site or in the St. Louis metropolitan area." Id.

In addition, the Corps noted that "Holcim cannot begin construction of the project without an air permit from the MDNR Air Pollution Control Program." Id. Plaintiffs argue that by relying on the MDNR's determination the Corps was unlawfully abdicating its authority under NEPA. Plaintiffs cite to Calvert Cliffs Coordinating Comm., Inc. v. Atomic Energy Comm'n, 449 F.2d 1109 (D.C. Cir. 1971). In Calvert Cliffs, the D.C. Circuit held that the Atomic Energy Commission's rules that "defer[red] totally to water quality standards devised and administered by state agencies" violated the case-by-case judgment mandated by the NEPA.

7

Id. at 1122.  By "abdicating entirely to other agencies' certifications" the Atomic Energy Commission had subverted the special purpose of NEPA.  Id. at 1123.

In the case at bar, the Corps did not entirely abdicate its decision-making authority to the certification of MDNR. Rather, the Corps merely evaluated relevant information made available from the MDNR air permitting process.  This information included additional modeling studies, which demonstrated that impact from project criteria pollutants (e.g. $PM_{10}$, sulfur dioxide, oxides of nitrogen, and carbon monoxide) would be below applicable National Ambient Air Quality Standards.  Plaintiffs argue that these studies are inadequate as they use the long established "coarse" particulate matter standard (i.e. $PM_{10}$) rather than the new "fine" particulate matter standards (i.e. $PM_{2.5}$). While the $PM_{2.5}$ standards have been promulgated by the Environmental Protection Agency ("EPA"), they have not been implemented and the Court perceives no deficiency in the use of the $PM_{10}$ standards.  See Fund for Animals v. Norton, 294 F.Supp.2d 92, 112 (D.D.C. 2003) (finding it "well within the agency's discretion to choose an air particulate modeling method, and [the] choice does not render it in violation of NEPA").  Additionally, Dr. Gary Saltzman -- a specialist in pulmonary medicine -- testified at the administrative hearing that both the $PM_{10}$ and $PM_{2.5}$ levels from the cement plant would not adversely impact the health of any residents in the

surrounding area or St. Louis.  Admin. Hearing Comm'n Tr., pp. 558-61 (A.R. at tab P-1).

        Finally, the Corps considered the impacts of the cement plant's mercury emissions.  The Corps considered modeling tests which indicated that the impact of hazardous air pollutants (including mercury) from the cement plant would not be significant to plants, soils, or animal life in the vicinity of the project. EA at 58.  These tests demonstrate that the levels of project criteria pollutants and hazardous air pollutants would be below the EPA and MDNR impact thresholds.  Id.  The Corps also considered a study performed by AER, Inc. (a independent firm hired by Holcim) on the potential effects of atmospheric deposition of mercury emissions on fish in the Mississippi River.  The study indicated that the "project may cause a 0.39 ppb increase in the existing 131 ppb value for mercury in Mississippi River fish located in the vicinity of the project." Id. at 59.  The Corps found this to be a "very small" increase compared to the "300-ppb threshold used by the State of Missouri for health-based fish advisories." Id.[5]

        In addition to considering the impact of the plant's air emissions, the Corps also determined that 3.2 miles of

_____

        [5]The Court is not persuaded that the AER study is undermined by its focus on the fish in the Mississippi River rather than those in smaller streams such as the Isle du Bois Creek.  As the game fish in the vicinity of the project are able to migrate between the various waterways it was reasonable to conclude that the mercury levels would be comparable in both the Mississippi River and in the small streams.

jurisdictional intermittent streams would be impacted by the project. EA at 3.[6] The Fish and Wildlife Service ("FWS") and the EPA initially questioned whether this was an accurate assessment. See FWS letter to Corps, Jan. 5, 2001, p. 7 (A.R. at tab B-3); EPA letter to MDNR, July 22, 2002, p. 2 (A.R. at tab R-8). The origin of these agencies' concern was a calculation performed by FWS employee Rick Hansen, who also authored the January 5, 2001 FWS letter to the Corps. However, Mr. Hansen later stated that his estimate was not scientific but was made by using a piece of string to perform a rough measurement on a site map. Addendum at p. 5 (A.R. at tab A-10). In addition, the Corps carefully outlined its calculation of 3.2 miles by using the Companion Report provided by Holcim. RTC at p. 132; Companion Report at §3.4 (A.R. at tab A-4). Furthermore, the Corps arranged for a site visit with the EPA and FWS in June 2003 and the FWS, in a letter dated June 17, 2003, does not dispute the Corps determination that 3.2 miles of jurisdictional intermittent streams will be impacted by the project. FWS letter to the Corps, June 17, 2003, pp. 2-3 (A.R. at tab B-11). In light of this evidence, the Court is not persuaded that the Corps failed to take a hard look at the number of miles of jurisdictional intermittent streams impacted by the project.

---

[6]The Corps' original determination was that 3.4 miles of jurisdictional streams would be impacted. However, a modification in the project plans reduced the number to 3.2 miles.

10

The Corps also considered the cumulative impacts of harbor dredging. The EA states that there is a "probable need for future maintenance dredging of 10,000 to 65,000 cubic yards, per year, of the accumulated sediments from the proposed harbor entrance and harbor bottom." EA at p. 21. However, the Corps concluded that cumulative maintenance dredging would not be significant. Id. at 74. The Corps based this determination, in part, on the fact that "[a]ll maintenance dredging activities would be accomplished with hydraulic dredging equipment to minimize the amount of sediment stirring." Id. at 21. In addition, all dredge material would be pumped to "an approved upland non-jurisdictional disposal location (or other future environmentally preferable location)." Id.

Moreover, while other agencies such as the FWS were initially concerned about the effects dredging would have upon endangered pallid sturgeon, their concerns were allayed by the Corps' response. In a July 29, 2002 letter to the Corps, FWS stated that "based on the information submitted in the [Corps'] June 27, 2002 letter, we concur that construction and maintenance dredging of the proposed harbor is not likely to adversely affect the pallid sturgeon." FWS letter to Corps, June 29, 2002 (A.R at tab B-4). Finally, any harbor dredging "would be in a more contained setting compared to the open flows and currents experienced directly in the Mississippi River," thereby reducing the possibility of down-river transport of sediment from the

11

harbor.  RTC at 136; <u>see also</u> Water Resources and Hydrology Report, p. 72 (A.R. at tab D-4).

In sum, a review of the record indicates that the Corps identified the areas of relevant environmental concern and took a hard look at each of these areas.  There is nothing in the record before the Court to indicate that the Corps failed to independently and reasonably evaluate all of the evidence presented during the permit process.  Rather, the Court believes that the Corps "made a good faith effort to consider the values NEPA seeks to protect" in reviewing the information presented.  <u>Mid States</u>, 345 F.3d at 533-34.

In addition to taking a hard look at the relevant issues of environmental concern, the Corps also evaluated Holcim's mitigation plans, which Holcim had "committed to perform . . . as part of the project."  EA at 5.  "An agency may certainly base its decision of 'no significant impact' on mitigating measures to be undertaken by a third party."  <u>Audubon Society of Central Arkansas v. Dailey</u>, 977 F.2d 428, 435-36 (8th Cir. 1992).  While the mitigation plan "need not be a condition of the permit" or a "contractual obligation," it "must be 'more than mere vague statements of good intentions.'"  <u>Id.</u> (<u>quoting</u> <u>Preservation Coalition, Inc. v. Pierce</u>, 667 F.2d 851, 860-61 (9th Cir. 1982).  Here, the mitigation plans are more than vague statements of good intentions.

12

The mitigation plans called for the creation and enhancement of 61 acres of high-quality wetlands to replace the 14 acres of existing wetlands that would be impacted by the project. EA at 4. Under the plan, Holcim would create 25.5 acres of new wetlands, enhance 12.8 acres of existing wetlands, restore the Lee Island slough to create a contiguous wetland complex, restore 22.8 acres of existing wetlands along the Isle du Bois Creek, and create intermittent streams on a 1:1 basis for those intermittent streams impacted by the project. Id. In addition, Holcim will implement a long term land reclamation strategy to reconstruct the existing rugged upland topography. The reclaimed areas would be seeded with native vegetation in order to re-establish the forest and provide a variety of wildlife habitats. Id. at 4-5. After reviewing these plans and taking a hard look at the relevant areas of environmental concern the Corps concluded that "the permit action will not have a significant impact on the quality of human life." Id. at 86.

Plaintiffs clearly disagree with Corps' determination and maintain that other agencies, including the FWS and EPA, also disagreed with the Corps' FONSI decision. While the EPA and FWS did initially raise questions regarding the environmental impact of the project and need for an EIS, in the end neither the FWS nor the EPA chose to elevate the Corps decision for higher review. In addition, the final position letter of the FWS states:

> Holcim and the Corps have modified the project, where considered feasible, to avoid or minimize impacts to the physical, chemical, and biological components of the site

13

and have attempted to incorporate in the project plan and permit conditions adequate compensatory mitigation measures to support a "finding of no significant impact."

FWS letter to the Corps, June 17, 2003, p.2 (A.R. at tab B-11).

However, even if other agencies continued to dispute some of the findings made by the Corps, this would not render the Corps' decision arbitrary or capricious. <u>Wetlands Action Network v. U.S. Army Corps of Engineers</u>, 222 F.3d 1105, 1120-21 (9th Cir. 2000). There is a "rational connection" between the facts found in the record and the determination by the Corps that the project would not have a significant impact on the environment. <u>Missouri Coalition for the Environment v. Corps of Engineers of the United States Army</u>, 678 F.Supp. 790, 802 (E.D.Mo. 1988). Thus, the Corps' decision to refrain from preparing an EIS was not a clear error of judgment.

## II.  Practicable Alternatives

As stated above, Holcim's proposed plans for the construction of a cement manufacturing plant require a CWA fill permit for the discharge of material into the navigable waters of the United States. 33 U.S.C. §1344(a). Under federal regulations, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. §230.10(a). NEPA also requires a permitting agency to consider the "available alternatives." 42 U.S.C. §4332(2)(E). <u>See</u>

14

also 40 C.F.R. §1508.9 (requiring an agency's EA to include a "brief discussion of . . . alternatives").

Central to evaluating whether the Corps' alternatives analysis was sufficient is the determination of the project's purpose. Here, "Holcim's stated overall project purpose is to construct a 4 Million Ton . . . per year portland cement plant, including a limestone quarry, harbor, and barge fleeting area, at a central location on the Mississippi River." EA at 5. The Corps found that "Holcim's purpose of achieving major navigable river access at a central location . . .is a legitimate one." Id. at 6. Plaintiffs argue, however, that the "general goal" of the project was to construct a cement manufacturing plant and that such a plant is not water dependent. As such, plaintiffs contend that the Corps must assume that practicable alternatives exist. See National Wildlife Federation v. Whistler, 27 F.3d 1341, 1344 (8th Cir. 1994) ("[I]f a dredge or fill permit application does not concern a water-dependent project, the Corps assumes that practicable alternatives exist unless the applicant 'clearly demonstrated otherwise.'") (quoting 40 C.F.R. 230.10(a)(3)).

In arguing that a project's "general goal" controls the alternatives analysis, plaintiffs rely on the Seventh Circuit's decision in Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986). There, an application was made to the Corps to build a facility that would transload coal from trucks to barges on the Mississippi River. The Seventh Circuit found that an "evaluation of

15

'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the *general* goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." <u>Id.</u> at 638 (emphasis in original). Thus, the Seventh Circuit concluded that the "general goal" of the project in <u>Van Abbema</u> was to build a facility that could "deliver coal from mine to utility," rather than a facility that could transload coal from trucks to barges. Similarly, plaintiffs contend the general goal of the instant project is to build a cement plant rather than a cement plant, harbor, and barge fleeting area.

However, as the D.C. Circuit has recognized, the "general goals" approach taken in <u>Van Abbema</u> suffers from "two critical flaws." <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 199 (D.C. Cir. 1991). First, the "general goal" approach misconstrues the language of NEPA as "NEPA plainly refers to alternatives to the 'major *Federal* actions significantly affecting the quality of the human environment,' and not to alternatives to the applicant's proposal. <u>Id.</u> at 199 (<u>quoting</u> 42 U.S.C. §4332(2)(C)) (emphasis in original). Secondly, <u>Van Abbema</u> fails to answer "why and how to distinguish general goals from specific ones and just who does the distinguishing." <u>Id.</u> The implication in <u>Van Abbema</u> is that a reviewing court should define the purpose of the agency action. <u>Id.</u> However, a judicially-defined project purpose

16

would appear to violate the deferential standard of review required under the APA. <u>Whistler</u>, 27 F.3d at 1344. Thus, rather than use the "general goals" approach, the Court will consider whether the agency-defined project purpose is "so unreasonably narrow" as to make the alternative analysis "a foreordained formality." <u>City of Bridgeton v. FAA</u>, 212 F.3d 448, 458 (8th Cir. 2000).

Upon careful review, the Court does not believe that the project purpose as defined by the Corps is unreasonably narrow. First, the project purpose as defined by the Corps was sufficiently broad to allow the Corps to consider at least six alternative sites. EA at pp. 12-17. Second, the Corps properly considered the objectives of Holcim in supplying cement to the Mississippi River market and competing with foreign cement producers who use the Mississippi River to import approximately $1.5 billion in cement. EA at pp. 5-6. <u>See</u> <u>Louisiana Wildlife Fed'n, Inc. v. York</u>, 761 F.2d 1044, 1048 (5th Cir. 1985) (per curiam) (finding it "bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable"). Finally, the Corps considered that barge shipment would be the most cost-effective means of transportation. EA at 6. <u>See</u> <u>Sylvester v. U.S. Army Corps of Engineers</u>, 882 F.2d 407, 409 (9th Cir. 1989) ("Corps may legitimately consider such facts as cost to the applicant and logistics.") In light of these findings, the Corps provided a "rational explanation" for its conclusion that

17

Holcim's stated purpose of constructing a cement plant, harbor, and barge fleeting area was legitimate.  Whistler, 27 F.3d at 1344.

As the Corps was justified in finding the project was "water dependent," no assumptions are raised as to the availability of alternatives.  Rather, the Corps must evaluate a reasonable range of alternatives to determine if any are practicable. However, the Corps "was not required to study remote and speculative possibilities."  Olmsted Citizens for a Better Community v. United States, 793 F.2d 201, 209 (8th Cir. 1986). There has been no evidence presented to the Court that "show[s] that feasible alternatives exist."  Id.  Rather, as recognized by the FWS, "the Corps EA does provide a relatively thorough analysis of alternative project designs and sites, concluding that only the [proposed] Lee Island site could meet all of Holcim's project purposes and needs."  FWS letter to the Corps, June 17, 2003, p.2 (A.R. at tab B-11).  Therefore, the Court concludes that neither the Corps' project definition nor its decision that no practicable alternatives existed was arbitrary or capricious.


III.  Public Participation

CWA regulations provide that requests for public hearing shall be granted, "unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing."  33 C.F.R. §327.4.  Thus, the determination of whether to hold a public hearing lies within the

18

Corps' discretion. <u>Missouri Coalition for Environment</u>, 678 F.Supp. at 797. In the case at bar, plaintiffs contend that the Corps abused its discretion by issuing the permit without a public hearing.

The Corps' decision to not hold a public hearing was "based on a review of the comments generated by [the Corps'] public notices, a subsequently held public workshop, meetings with various stakeholders, and notably that comments were accepted for the entire duration of the permit evaluation procedure." Public Notice, July 11, 2003 (A.R. at tab A-11). The Corps first published notice of Holcim's application for a permit on November 6, 2000. Public Notice, Nov. 6, 2000 (A.R. at tab A-5). Following this notice and until May 1, 2003, the Corps accepted comments from individuals and various groups, including plaintiffs. The Corps addressed these comments in its 351-page RTC. Furthermore, the Corps held a public workshop on January 24, 2001 in order to "solicit input and discussion from the public." Public Notice, Dec. 6, 2000 (A.R. at tab A-6). Given the volume of comments generated by these measures, it is highly unlikely that a public hearing would have "generate[d] any new information that was not already in the Corps' possession." <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d 535, 545 (11th Cir. 1996). Additionally, all of the substantive arguments raised by plaintiffs in their motion for summary judgment were addressed by the Corps during the permit process and plaintiffs have not identified any issue that they were

19

unable to raise because there was not a public hearing.  Thus, it was not an abuse of discretion for the Corps to decline to hold a public hearing.

Finally, the Court must consider whether the Corps properly involved the public in the preparation of the EA/FONSI. Council on Environmental Quality regulations provide that an "agency shall involve environmental agencies, applicants, and the public, to the extent practicable" when preparing an EA.  40 C.F.R. §1501.4(b).  See also 40 C.F.R. §1506.6(a) (requiring agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures").  Plaintiffs argue that the regulations required the Corps to provide the public an opportunity to comment on a draft EA.

For support, plaintiffs cite to Citizens for Better Forestry v. U.S. Forest Serv., 341 F.3d 961, 970 (9th Cir. 2003). In that case, the Ninth Circuit found that there was "a complete failure to involve or even inform the public about an agency's preparation of an EA and FONSI."  Id. at 971.  Such "wholesale neglect" of the public in the process violated the very purpose of NEPA, which was to ensure that federal agencies are informed of environmental consequences.  Id. at 970-71.  As outlined above, there was not a "wholesale neglect" of the public in the instant evaluation process.  Rather, the public was promptly notified of Holcim's application and involved throughout the evaluation process.  Clearly this process complied with the purpose of NEPA

20

and the Corps' decision not to provide a draft EA/FONSI for public comment was not arbitrary and capricious.  See Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1279 (10th Cir. 2004) (rejecting argument that Corps acted arbitrarily by failing to release a draft EA and other documents prior to issuing its decision); Pogliani v. United States Army Corps of Eng'rs, 306 F.3d 1235, 1238-39 (2d Cir. 2002) (per curiam) (holding that environmental plaintiffs were unlikely to succeed on their claim that the Corps "erred by failing to release its draft EA and FONSI for public comment prior to their issuance").

## Conclusion

In arguing that the Corps erred in issuing a permit to Holcim for the construction of a cement manufacturing facility, plaintiffs repeatedly invite the Court to substitute its judgment for the Corps.  The appropriate question for the Court, however, is whether the Corps acted arbitrarily and capriciously in issuing the permit.  It did not.  The Corps properly included the public to reach an informed decision.  Neither the Corps' project definition nor its decision that no practicable alternatives existed was arbitrary or capricious.  Finally, the Corps took a hard look at the relevant areas of environmental concern and made a convincing statement that the project would not significantly impact the environment.  Therefore, the Corps' decision to issue the permit must be upheld.

21

Accordingly, for all the foregoing reasons,

**IT IS HEREBY ORDERED** that Holcim's motion for summary judgment [Doc. #29] is granted.

**IT IS FURTHER ORDERED** that the Federal defendants' motion for summary judgment [Doc. #32] is granted.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment [Doc. #35] is denied.

**IT IS FURTHER ORDERED** that defendants' joint motion to strike [Doc. #48] is granted to the extent that Exhibit 1 attached to plaintiffs' reply [Doc. #47] is deemed stricken from the record. In all other respects the motion is denied.

Dated this _____ day of September, 2004.

_____
UNITED STATES DISTRICT JUDGE